**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-21-02529-001-TUC-RM (LCK) |
| Plaintiff, | **ORDER** |
| v. | |
| Ralph G. Lewis, | |
| Defendant. | |

Pending before the Court is Defendant's Motion to Suppress Statements (Doc. 36), to which the Government responded (Doc. 50). Magistrate Judge Lynnette C. Kimmins held evidentiary hearings on December 1, 2022, and January 5, 2023. (Docs. 57, 69.) Thereafter, Judge Kimmins issued a Report and Recommendation ("R&R"), recommending this Court deny the Motion to Suppress. (Doc. 84.) Defendant filed an Objection (Doc. 93), and the Government responded (Doc. 94). For the following reasons, the Court will adopt Judge Kimmins's R&R, overrule Defendant's Objection, and deny the Motion to Suppress.

**I.   Background**

Defendant Ralph Lewis was indicted on one count of involuntary manslaughter of K.H., his infant nephew, in violation of 18 U.S.C. §§ 1153 and 1112, and one count of child abuse of K.H., in violation of 18 U.S.C. § 1153 and A.R.S. §§ 13-3623(A)(1) and 13-705. (Doc. 1.) Defendant is a member of the Tohono O'odham Nation, and the injury and death of the infant victim are alleged to have occurred within the territory of the Nation.

(*Id.*) On the morning of December 27, 2018, Tohono O'odham Police Department ("TOPD") officers responded to a 911 call made from Defendant's residence. (Doc. 60 at 6.) A TOPD officer spoke briefly with Defendant upon responding to that call. (*Id.* at 7.) Subsequently, law enforcement interviewed Defendant about this case on three occasions. First, on December 27, 2018, the same day the 911 call was made, TOPD detectives interviewed Defendant at TOPD's San Xavier police substation. (*Id.* at 8.) The detectives did not read Defendant his *Miranda* rights prior to that interview. (*Id.* at 9, 21-22.) Second, on January 10, 2019, FBI Special Agent ("SA") Nathan Wood and a TOPD detective interviewed Defendant at the TOPD station in Sells. (*Id.* at 11-12.) Detective Elkdreamer read Defendant his *Miranda* rights prior to this interview. (*Id.* at 13-14; Doc. 79 at 9.) Third and finally, on October 8, 2020, SA Oscar Ramirez and SA Wood ("the agents") interviewed Defendant at his workplace in San Xavier. (Doc. 60 at 46-47.) Defendant's Objection (Doc. 93) to the R&R (Doc. 84) arises from the R&R's recommendation to deny Defendant's Motion to Suppress (Doc. 36) the statements made on October 8, 2020.

On October 8, 2020, SAs Ramirez and Wood arrived at the Sells Hospital to interview Defendant. (Doc. 60 at 46.)[1] At the time, Defendant served as a security lead for Tohono O'odham Nation Health Care. (Doc. 79 at 18.) In this capacity, Defendant had supervisory authority over seven other employees and access to all four of the Nation's health care facilities, including the Sells and San Xavier locations. (*Id.*) Medical personnel had opined that the victim sustained non-accidental traumatic brain injuries (Doc. 60 at 45), and both SA Ramirez and SA Wood believed Defendant was responsible for the injuries. (*Id.* at 27, 85.) Defendant was not at the Sells Hospital when the agents arrived. (*Id.* 46.) SA Ramirez testified that he called Defendant and "told [him] that [they] needed to talk to him regarding the investigation of [K.H.]." (*Id.* at 47.) SA Ramirez further

---

[1] Defendant states that on October 8, 2020, SA Ramirez "'did a courtesy and contacted [Mr. Lewis'] supervisor to let him know that [he and Agent Wood] would be speaking with [Mr. Lewis]' and an interview with Mr. Lewis was coordinated through his supervisor." (Doc. 93 at 4 (quoting Doc. 60 at 11-12.).) However, in the cited exchange, SA Ramirez appears to be referring to the January 10, 2019 interview which occurred at TOPD's main station in Sells. (*See* Doc. 60 at 11("what I want to talk to you about is an interview that was conducted on January 10th of 2019…Q: Where was this interview conducted? A. At the Tohono O'Doham Police Department.").)

testified that he "told [Defendant] that it was completely voluntary and that [they] just needed to talk to him to conclude the investigation." (*Id.*)

SA Ramirez offered options for the interview location, including the downtown Tucson FBI station or the agent's FBI vehicle. (Doc. 60 at 87-88; Doc. 79 at 10.) Defendant told SA Ramirez that it was difficult to park his vehicle downtown, so they agreed to meet at the San Xavier health facility where he was working that day. (Doc. 60 at 47; Doc. 79 at 19-20.) The agents drove an hour from Sells to meet Defendant at his desired location. (Doc. 60 at 47; Doc. 79 at 20-21.) SA Ramirez recorded the entirety of the interview. (Doc. 60 at 48.) The entire interview lasted about an hour and 40 minutes. (Ex. 10 at 83.) SA Wood and SA Ramirez had guns in their hip holsters, but they were covered by clothing, and Defendant never saw that they were armed. (*Id.* at 28, 29-30, 52-53.) Defendant met the agents outside, and then led them to a conference room he had chosen for the interview. (Doc. 60 at 54-55; Doc. 79 at 22-24.) That conference could hold up to 20 people and was over 15 feet by 21 feet. (Doc. 60 at 35, 37, 55; Doc. 79 at 24-25.) The agents did not handcuff Defendant, and Defendant was free to move around. (Doc. 60 at 60; Doc. 79 at 28.)

SA Ramirez advised Defendant that the interview was voluntary and he could end it at any time, and the agents never threatened him. (Doc. 60 at 62; Doc. 79 at 28.) SA Ramirez never told Defendant that he could not leave or that "he had no choice but to sit with [SA Ramirez] and answer questions." (Doc. 60 at 111.) At the onset of the interview, after dispensing with formalities and biographical questions, SA Ramirez had the following exchange with Defendant:

> SPECIAL AGENT RAMIREZ: Okay. Sir, once again, this is completely voluntary. Okay? Obviously, we're not even in law enforcement space. So at any time during the interview, if you want to stop the interview, you can tell us to leave. Tell us to stop. You can stop yourself and you can leave yourself, obviously, because this is your building. Do you understand all that?
>
> MR. LEWIS: Sure.
>
> SPECIAL AGENT RAMIREZ: Like I said before, we just want to conclude this. . . . This is completely voluntary. You are not under arrest. You're not going to be arrested immediately following the interview. That decision is not even made by us,

- 3 -

    it's made by the United States Attorney's Office usually in the future. Do you understand all that?

    MR. LEWIS: Uh-huh.

(Ex. 10 at 8.)[2] SA Ramirez advised Defendant that the interview was voluntary two additional times during the interview. In the first instance, SA Ramirez stated, "I can't force you to do the right thing…This is completely voluntary." (Ex. 10 at 50.) In the second instance, SA Ramirez reiterated, "I can't force you to do the right thing. This is completely voluntary." (Ex. 10 at 61.) Later in the interview, SA Ramirez again emphasized that Defendant was not under arrest, stating, "[w]hatever you tell me today, we're going to leave, you're gonna walk out. That decision is not made overnight." (Ex. 10 at 79-80.)

  The interview moved to a different room, again chosen by Defendant, when another employee informed them that they had to use the room. (Doc. 60 at 66.) In both rooms, Defendant was alone with the agents with the door closed. (*Id.* at 89; Doc. 70 at 11.) SA Ramirez did not ask if Defendant wanted to have anyone present with him. (Doc. 60 at 89.)

  Throughout the interview, SA Ramirez confronted Defendant with evidence of his guilt and the fact that he believed Defendant caused the victim's death. For example, SA Ramirez told Defendant that "we know, based on your truthful information, that you were responsible for whatever happened" (Ex. 10 at 41), that Defendant's previous statements "prove that [he] did it. That [Defendant is] responsible for [K.H.'s] injuries" (Ex. 10 at 48), and that "the facts right now…put [Defendant] as a criminal. The facts right now show [Defendant is] a murderer." (Ex. 10 at 49.) SA Ramirez claimed that medical evidence against Defendant was "conclusive." (Ex. 10 at 39.) SA Ramirez also informed Defendant that he had lost his child to a medical condition when he was six years old. (Ex. 10 at 47.)

  Defendant testified that, to stop SA Ramirez from making such accusations, he told the agents that he accidentally dropped K.H. (Doc. 79 at 13.) Defendant further testified that it was true that he accidentally dropped the baby onto the bassinet, and he admitted that he had not told law enforcement that during prior interviews. (*Id.* at 37-38.) During the

---

[2] "Ex." refers to the exhibits admitted at the evidentiary hearings held on December 1, 2022 and January 5, 2023.

interview, agents repeatedly expressed that the drop Defendant described would not have caused the injuries that the victim sustained. (Ex. 10 at 59-60, 64-80.) Shortly before the interview ended, SA Ramirez told Defendant that he was there "for [K.H.]…for a child that's dead…that was killed by you…to find Justice for him." (Ex. 10 at 82-83.) Defendant responded stating: "And I said that's what happened. That's what took place. There's nothing else. And we're done." (Ex. 10 at 82.) The agents left the room, Defendant followed, and Defendant showed the agents how to exit the facility. (Ex. 10 at 82-83; Doc. 60 at 71; Doc. 79 at 17.)

## II. Standard of Review

A district judge must "make a de novo determination of those portions" of a magistrate judge's "report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation"). Failure to object to the findings and recommendations of the magistrate judge "waives a party's right to review." Fed. R. Crim. P. 59(b)(2).

Here, the R&R found that Defendant was not in custody during the October 8, 2020 statements, and therefore, no *Miranda* violation occurred. (Doc. 84 at 13.) The R&R further found that Defendant's statements were voluntary. Defendant objected to both findings. Thus, the Court will review each determination *de novo*.

## III. Discussion

### A. *Miranda*

Defendant asserts that his statements made during the October 8, 2020 interview should be suppressed because he was not advised of his *Miranda* rights despite being in custody. "An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). A suspect is in custody where "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005). "The inquiry focuses on the objective

circumstances of the interrogation, not the subjective views of the officers or the individual being questioned." *Kim*, 292 F.3d at 973. The Ninth Circuit examines the totality of the circumstances and the following relevant factors: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987). Here, the Government acknowledges that the agents did not give Defendant *Miranda* warnings before the October 8, 2020 interview.[3] Thus, guided by the above factors, the Court must determine whether Defendant was in custody.

Under the first factor of the custody analysis, the Court considers the language the agents used to summon Defendant. *Beraun-Panez*, 812 F.2d at 580. In cases in which the Ninth Circuit has found an interrogation non-custodial, the Court has emphasized that the defendant voluntarily "agreed to accompany" officers to an interview location. *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009). By contrast, an officer "ordering" a defendant to an interview location weighs in favor of finding a custodial interrogation. *Id.* In *Norris*, the suspect, Norris, moved to suppress his inculpatory statements on the basis that officers took the statements while he was in custody without advising him of his

---

[3] At the evidentiary hearing, SA Ramirez was asked why he would not Mirandize someone, even if just to be safe:

> Q. What would be a reason not to Mirandize somebody? Why not just do it to be safe?
> A. Because we don't have to. And that's -- that would be more of a reason for him to request an attorney, and then we wouldn't do the interview.
> Q. So somebody is more likely to talk to you, obviously, if they're not Mirandized.
> A. No. It's just one of those things that we don't need to do, so we don't do it. It's one more obstacle.
> Q. An obstacle to talking to the person, correct?
> A. Yes.

(Doc. 60 at 109.) The Court concurs with the R&R (Doc. 84 at 7-8, n.6) that because an agent's subjective belief is not relevant to the custody analysis, it is not appropriate to weigh this testimony here. *See Kim*, 292 F.3d at 973 (the custody inquiry "focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned."). However, this Court joins the R&R in expressing its extreme concern over SA Ramirez's testimony that *Miranda* is an obstacle to obtaining a person's statement.

*Miranda* rights. *Norris*, 428 F.3d 907 at 911. Officers initially arrived at Norris's home to question him. *Id.* at 910. But because Norris had no electricity, officers suggested that the police substation would be a more appropriate location. *Id.* Norris informed the officers that he had no problem talking to them and voluntarily accompanied the officers to the substation. *Id.* Officers advised Norris that his cooperation was voluntary, he was not under arrest, and he was free to terminate the interview at any time. *Id.* The officers never restrained Norris in any way. *Id.* at 11. The Ninth Circuit determined these facts weighed against finding Norris was in custody for *Miranda* purposes. *Id.* at 12.

In this case, SA Ramirez phoned Defendant with a request to interview him and offered him several interview locations. As the Government states, Defendant voluntarily agreed to participate in the interview. Defendant exercised at least some control over the interview setting by providing feedback on the time and location. The agents agreed to Defendant's workplace as the interview location, with Defendant's input. The agents drove an hour to accommodate Defendant's choice. Defendant also selected the specific spaces where the interview occurred within his workplace, not once but twice. Like the officers in *Norris*, SA Ramirez advised Defendant that the interview was completely voluntary, that he was not under arrest or going to be arrested immediately following the interview, and that he could stop the discussion and tell the officers to leave at any time. Like the suspect in *Norris*, Defendant was never restrained in any way. Defendant appears to emphasize that SA Ramirez told Defendant that they "needed" to talk to him to rebut the voluntary nature of the interview. However, Defendant's argument is not persuasive, considering the explicit advisement that the interview was voluntary and the full context described here.[4] Based on these circumstances, this factor weighs against a finding that Defendant's interrogation was custodial.

---

[4] Under the first factor, Defendant argues that SA Ramirez repeatedly directing Defendant to tell him why and how he injured K.H. supports finding Defendant was in custody. (Doc. 93 at 9-10.) The Court agrees that this fact supports such a finding. However, this fact is more appropriately addressed under the second factor of the analysis—the extent to which the defendant is confronted with evidence of guilt. Therefore, the Court will address this fact under the second factor.

The second factor requires the Court to evaluate the extent to which the agents confronted Defendant with evidence of guilt. *Beraun-Panez*, 812 F.2d at 580. In *Beraun-Panez*, the suspect moved to suppress statements to law enforcement who failed to provide *Miranda* warnings. *Id.* at 579. The Ninth Circuit concluded the suspect was in custody for *Miranda* purposes. *Id.* at 582. There, officers repeatedly accused the defendant of lying, told him that witnesses had placed him at the scene, and insisted on the "truth" until he told them what they sought. *Id.* at 580. By contrast, the Ninth Circuit has found a defendant not in custody for *Miranda* purposes when the officers "did not attempt to challenge [the suspect's] statements with other 'known facts' suggesting his guilt" and "merely asked [him] about the allegations." *Norris*, 428 F.3d at 913; *see also Bassignani*, 575 F.3d at 884 (concluding this factor weighed against finding the interrogation was custodial where the entire interview was "plainly consensual" and "conducted in an open, friendly tone").

Here, the R&R determined that this factor weighed in favor of finding that Defendant was in custody. As the R&R explains, "SA Ramirez confronted Defendant with evidence of his guilt numerous times, told him he was responsible for the victim's death, and repeatedly challenged Defendant that his explanation was not the truth." (Doc. 84 at 9.) The confrontational nature of the interview is like that in *Beraum-Panez* and sharply distinguishable from the more passive nature of the dialogue in *Norris* and *Bassignani*. Defendant does not object to the R&R's determination on this factor. Furthermore, although Defendant listed this argument under the first factor, the Court agrees that SA Ramirez repeatedly directing Defendant to tell him why and how he injured K.H. weighs in favor of concluding that the interview was custodial. The Government, for its part, acknowledges that the interview "becomes confrontational" at about 43:42 of the recording, "which means the intense portion of the discussion lasts about an hour." (Doc. 94 at 7.) It further concedes that the agents told Defendant he was guilty and that the evidence showed it. However, the Government asserts that the interview did not have a coercive tone and Defendant showed a willingness to answer questions. The Court is not persuaded that these facts sufficiently diminish the extent to which the agents confronted

1  Defendant with evidence of his guilt. Based on the foregoing, the Court concludes that the
2  second factor supports finding that Defendant was in custody.

3  Next, the Court addresses the third factor: the physical surroundings of the
4  interrogation. *Beraun-Panez*, 812 F.2d at 580. Under this factor, the Ninth Circuit has held
5  that "an interrogation conducted in familiar surroundings weighs against a finding that the
6  defendant was in custody." *Bassignani*, 575 F.3d at 885. However, isolating a suspect from
7  the outside world largely negates the familiarity of the location. *Id.* The Ninth Circuit also
8  considers the number of law enforcement personnel present and whether they were armed.
9  *United States v. Craighead*, 539 F.3d 1073, 1085 (9th Cir. 2008) (finding eight law
10 enforcement officers entering a suspect's home, all armed and some with unholstered
11 weapons and protective gear, contributed to a police-dominated atmosphere). The
12 following cases are instructive.

13 In *Bassignani*, a case in which the defendant sought to suppress statements on
14 *Miranda* grounds, officers interviewed the suspect at a conference room within his
15 workplace, which the Court noted was "plainly a familiar environment." *Bassignani*, 575
16 F.3d at 885. Officers did not prevent anyone from entering or exiting the interview or the
17 suspect from contacting others. *Id.* The Court concluded that the physical surroundings of
18 the interrogation did not suggest that the suspect was in custody. *Id.* at 886. The *Bassignani*
19 Court distinguished that case from *Kim*. *Id.* In *Kim*, the suspect, Kim, and her husband
20 arrived at their store to "many police cars" in the parking lot. *Kim*, 292 F.3d at 971. Officers
21 allowed Kim, who spoke limited English, inside the building but locked her husband out.
22 *Id.* The Court explained that police "temporarily took over complete control of Kim's store,
23 creating 'a police-dominated atmosphere,' in which the police kept Kim physically isolated
24 from two family members who could have provided both moral support and, given her
25 limited English, a more complete understanding of the overall situation." *Id.* at 977. The
26 Court concluded that a reasonable person would not have felt free to leave. *Id.*

27 Here, as in *Bassignani*, Defendant's interview occurred at his workplace, a familiar
28 place of Defendant's choosing. As stated by SA Ramirez at the start of the interview, "you

can leave yourself, obviously, because this is your building." (Ex. 10 at 8.) Defendant was alone with the two agents in both rooms with the door closed. Defendant did not request to contact anyone or to have someone present with him, and the agents did not offer the option. The fact that another employee interrupted the interview and required a location change indicates that the agents did not completely control the environment. Defendant also encountered another person at that time and briefly left the isolation of the interview room. Unlike in *Bassignani* and *Craighead*, which involved significant police presence, SA Ramirez and SA Wood were the only law enforcement to engage Defendant. And unlike in *Craighead*, where officers were visibly armed and some unholstered their weapons, the agents' weapons here were covered, and Defendant did not see them. These facts distinguish the atmosphere Defendant experienced from the police-dominated atmosphere in *Craighead* and *Bassignani*. Defendant appears to argue that this factor supports finding that Defendant was in custody, in part because the interview occurred at Defendant's workplace and his position as a security officer was designated as law enforcement at the time. However, those facts support that the location was familiar and therefore weigh against finding that the interview was custodial. Thus, the Court concludes that this factor weighs against finding Defendant was in custody.

The Court now turns to the fourth factor of the custody analysis, the duration of the detention. *Beraun-Panez*, 812 F.2d at 580. In *Kim*, discussed above, the Ninth Circuit concluded the suspect was in custody when officers interrogated her for 45 to 90 minutes. *Kim*, 292 F.3d at 972. In *Bassignani*, the suspect's interview lasted two-and-a-half hours. *Bassignani*, 575 F.3d at 882. The Ninth Circuit described that length as "at the high end" and concluded it weighed in favor of finding that the suspect was in custody. *Id.* at 886. But the Court "accord[ed] less weight to this factor" because it was not a "marathon session designed to force a confession." *Id.* As discussed above, the Court characterized the interview as friendly and plainly consensual.

. . . .

. . . .

Here, Defendant's interview lasted about an hour and 40 minutes. During that time, the agents repeatedly confronted Defendant with evidence of his guilt.[5] The Government acknowledges that "the intense portion of the discussion lasts about an hour," including the time it took to change rooms. (Doc. 94 at 7.) Although short of a marathon session, the interview's length and intensity suggest that it was designed to force a confession. Based on the foregoing, the Court finds that the length of the interview weighs in favor of finding that Defendant was in custody.

Finally, the Court examines the amount of pressure the agents applied to detain Defendant, the fifth factor in the analysis. *Beraun-Panez*, 812 F.2d at 580. The Ninth Circuit has "consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time." *Bassignani*, 575 F.3d at 886. "If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody." *Craighead*, 539 F.3d at 1087; *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) ("Perhaps most significant for resolving the question of custody, Defendant was expressly told that he was not under arrest"). Furthermore, "[b]eing aware of the freedom to depart, and in fact departing after questioning…suggest that the questioning was noncustodial." *Id.* at 1060.

Under the fifth factor, courts also evaluate whether the defendant was restrained by physical force, threats, or pressure to confess or otherwise stay in the interview location. *Bassignani*, 575 F.3d at 886. In assessing this factor in *Bassignani*, the Ninth Circuit heavily weighed the fact that the officer did not pressure the suspect to confess or to stay in the interview room. *Id.* at 886. The Court also noted that although the officer never explicitly told the suspect that he was free to leave, the officer emphasized that he was not under arrest. *Id.* Finally, the Court noted that the suspect was never physically restrained. *Id.*

---

[5] Defendant does not make an argument regarding this factor, but simply recites the fact that "[t]his interrogation was approximately 1 hour and 40 minutes in duration." (Doc. 93 at 10.)

- 11 -

Here, early in the interrogation, the agents told Defendant that he was not under arrest and not going to be arrested immediately following the interview. The agents also informed Defendant that the interview was completely voluntary, and that Defendant could stop the discussion and tell the agents to leave at any time. Defendant verbally acknowledged that he understood these statements. Additionally, Defendant was never physically restrained. Unlike the officer in *Bassignani*, the instant facts reflect that the agents pressured Defendant to confess by repeatedly confronting him with statements about his guilt and the evidence against him. Defendant highlights SA Ramirez calling Defendant a murderer and discussing the loss of his own child as particularly coercive. The pressure the agents put on Defendant to confess was indeed high, as expressed in the analysis of the second factor. However, under this factor, the Court must also weigh that Defendant was never physically restrained and that the agents told Defendant he was not under arrest, the interview was voluntary, and that he could terminate the interview at any time. This communication reduced the likelihood that Defendant reasonably believed he was in custody. Ultimately, Defendant demonstrated his awareness of his freedom to terminate the interview by ending it. In weighing all these facts, the Court determines that this factor weighs against finding that Defendant was in custody.

After reviewing the totality of the circumstances and the relevant factors, the Court concludes that Defendant's freedom of movement was not restrained to the degree associated with a formal arrest. Therefore, Defendant was not in custody during the interview, and agents were not obligated to give Defendant *Miranda* warnings. Accordingly, Defendant's inculpatory statements are not inadmissible on these grounds.

### B. Voluntariness

Defendant argues that his inculpatory statements are inadmissible because they were involuntary as a result of the agents' coercion. Defendant asserts that the R&R failed to consider the totality of the circumstances of the interview that led to Defendant's statements. "Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence." *United*

*States v. Guerrero*, 847 F.2d 1363, 1365 (9th Cir. 1988). A statement is involuntary and therefore inadmissible if "considering the totality of circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Id.* at 1366. Factors to be considered include, but are not limited to, "the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011). Courts may also consider whether police advised the suspect of his rights and whether police made any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

Here, the interview lasted approximately an hour and 40 minutes, with agents extensively confronting Defendant with evidence of his guilt for about an hour. Although these facts weighed in favor of finding Defendant in custody for the *Miranda* analysis, the bar is higher for the voluntariness analysis. *Crawford*, 372 F.3d at 1061. For example, in *Crawford*, the Ninth Circuit held that a defendant's confession was voluntary where the interview at the FBI office took about an hour. *Id.* In arriving at their holding, the Court expressed that "[w]e have upheld as voluntary confessions obtained after much lengthier interrogations." *Id.*; *see also United States v. Haswood*, 350 F.3d 1024, 1028 (9th Cir. 2003) ("Even if we assume that the interrogation lasted all day…coercion typically involves far more outrageous conduct."). As the Government notes, the agents did not threaten Defendant. Furthermore, the fact that the interview occurred at Defendant's workplace, a familiar location, weighs in favor of finding Defendant's interview voluntary.

Defendant does not argue that his maturity, education, physical condition, mental health, or age support finding that the interview was involuntary. At the time of the interview, Defendant was 41 years old, married with three children, and served as security lead for Tohono O'odham Nation Health Care with supervisory authority over seven other employees. (Doc. 79 at 7, 18-19.) As Defendant points out, his position was designated

part of law enforcement at the relevant time. These facts weigh in favor of finding that Defendant's statements were voluntary.

As explained above, Defendant was not in custody during the interview. The agents advised Defendant that the interview was voluntary, he was free to terminate the interview at any time, and he would not be taken into custody that day. Defendant indicated that he understood these advisements and ended the discussion without being arrested. The agents did not make any direct or implied promises of a benefit. Furthermore, as the Government asserts, the agents did not engage in deception, and the transcript does not suggest the agents' actions were coercive such that Defendant's will was overborne. After evaluating the totality of the circumstances, the Court finds that Defendant's statements were voluntary.

Accordingly,

**IT IS ORDERED** that the Report and Recommendation (Doc. 84) is **accepted and adopted**, as set forth above.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Defendant's October 8, 2020 Statements (Doc. 36) is **denied.**

**IT IS FURTHER ORDERED** that Defendant's Objection (Doc. 93) is **overruled**.

Dated this 13th day of July, 2023.

_____
Honorable Rosemary Márquez
United States District Judge